STONE, J.
We affirm Mangum’s conviction and life sentence for first-degree murder with a firearm and possession of a weapon on school property. Mangum raised five issues on appeal; we address two.
The facts leading up to the convictions are as follows. Mangum brought a loaded handgun to school and fired three shots at the victim, killing him. Following the shooting, several officers searched the school and found Mangum in his assigned classroom. When the officers entered the classroom, Mangum stood up, raised his arms, and said, “I give up, it was just an argument.” Mangum confessed and gave a voluntary statement to the police. According to his statement, Mangum had personal problems with the victim stemming from a disagreement over a watch. Mangum stated that the victim let him hold his watch. When Mangum would not return it, a conflict ensued. On the day before the shooting, a friend of the victim tried to take the watch off Mangum’s wrist. When Mangum refused to let go of the watch, the friend threatened him. The next day, Mangum brought a handgun to school. Mangum stated that he was protecting himself when he shot the victim.
A classmate testified that Mangum ran up to him in the hallway just after the shooting and placed the handgun in his hand, but he gave it back to Mangum. At this time, Mangum stated, “I just shot somebody” and then ran down the hallway. The witness walked to his next class and saw Mangum standing behind a portable. The police later recovered the gun near that location.
Mangum was declared indigent shortly before trial. Clinical evaluations were initiated on Mangum in the Palm Beach County Jail. Psychological testing included the administration of the Minnesota Multi-phasic Personality Inventory (MMPI) and the Wexler Intelligence Scale for Children-Revised (WISC-R). The MMPI results indicated that Mangum suffered from perceptual disturbances, hallucinations, and delusional thinking. The WISC-R results showed that Mangum had a low IQ. Further, the WISC-R results provided evidence of impairment in both the left and right hemispheres of Mangum’s cerebral cortex. According to Dr. Robert M. Ber-land, expert witness for the defense, cortical injury “adversely affects one’s ability to perceive things and to think accurately and realistically.”
Shortly before trial, defense counsel moved for funds to have a Positron Emission Tomography Scan (PET-Scan) test performed. Defense counsel argued, in support of the motion for funds, that Man-gum had a history of traumatic injuries. The defense sought the new test because it might confirm whether physical injury to the brain had impaired its function. According to Dr. Berland, a PET-Scan would determine whether Mangum’s injuries affected “both his reasoning and judgment on the one hand, and his mental health on *194 the other.” Such information could be used by the defense to demonstrate that Mangum lacked the requisite mental capacity to either waive his Miranda rights, given prior to his statement, or form the specific intent necessary to commit first-degree murder. Defense counsel advised the court that a PET-Scan would cost approximately $5,500.00 and could only be administered in Jacksonville, Florida.
The state countered that the test was unnecessary because defense counsel was not proceeding under an insanity defense. Further, the state argued that defense counsel did not seek to determine whether Mangum was competent, but only sought evidence that prior injuries might be a contributing factor. The state also expressed concern about the cost and noted that moving Mangum to Jacksonville created a security issue. The trial court denied the motion.
Appellant claims there was insufficient evidence to support a conviction for first-degree, premeditated murder. Our review of the record reveals sufficient evidence from which the jury could conclude that the homicide was premeditated. See Spencer v. State, 645 So.2d 377, 381 (Fla.1994), limited on other grounds by Rodriguez v. State, 753 So.2d 29 (Fla.2000); State v. Law, 559 So.2d 187 (Fla.1989); Wilson v. State, 493 So.2d 1019 (Fla.1986). Mangum obtained the gun two days before the shooting. On the morning of the shooting, Mangum pointed the handgun directly at the victim and fired three shots at close range, striking the victim in the heart. Numerous witnesses, classmates, friends, and school personnel testified that prior to the shooting, they saw Mangum call to the victim, who was across the street. The victim crossed the street and walked over to Mangum. One witness saw Mangum pull out a gun, point it at the victim, and fire three shots. Other witnesses saw the victim and Mangum arguing in front of the school. One heard the victim say, “no man” and “no, I don’t want to fight,” immediately before the three gunshots. Another witness, albeit whose competency was called into question by the defense, testified that on the morning of the shooting, he rode the school bus with Mangum and heard him say that he was going to shoot the victim.
We further conclude that the trial court did not abuse its discretion in denying a request for funds for neurological testing, which the defense contends would have provided additional insight into Man-gum’s mental capacity at the time of the shooting. See San Martin v. State, 705 So.2d 1337, 1347 (Fla.1997), cert. denied, 525 U.S. 841, 119 S.Ct. 105, 142 L.Ed.2d 84 (1998). In San Martin, the supreme court asserted that in evaluating a court’s refusal to provide funding, the reviewing court should consider: “(1) whether the defendant made a particularized showing of need; and (2) whether the defendant was prejudiced by the court’s denial of the motion.” Id. (citing Dingle v. State, 654 So.2d 164, 166 (Fla. 3d DCA 1995)). Here, there was no showing of need or prejudice.
Mangum relies on Hoskins v. State, 702 So.2d 202 (Fla.1997), wherein the supreme court ordered a new penalty phase proceeding where the trial court improperly denied the defendant’s request for a PET-Scan. In Hoskins, the expert testified that the PET-Scan was necessary for him to render a definitive opinion regarding the defendant’s mental condition. Consequently, the 'supreme court held it was error to deny the option for the PET-Scan and remanded the case with instructions to the trial court to consider whether the expert’s opinion would change after the defendant was tested. See id. at 209-10. On remand, the trial court found that the expert’s opinion changed based solely on the PET-Scan results. See Hoskins v. State, 735 So.2d 1281 (Fla.1999). The supreme court then remanded the cause for a new penalty phase proceeding. See id.
Hoskins is distinguishable. In this case, the defense expert had previously administered psychological tests on Mangum and *195 had concluded that Mangum suffered from a psychotic disturbance and experienced delusional paranoid thinking and perceptual disturbance, including hallucinations. The state expert also administered tests on Mangum, but could not substantiate the defense expert’s findings because Mangum did not answer truthfully. The defense expert agreed that Mangum had attempted to fake the outcome of the testing when examined by the state expert. For this reason, the defense requested the PET-Scan in order to confirm the defense expert’s findings that Mangum suffered prior injury causing him to experience delusions.
In Robinson v. State, 761 So.2d 269 (Fla.1999), cert. denied, — U.S. -, 120 S.Ct. 1568, 146 L.Ed.2d 466 (2000), the supreme court found no error in the trial court’s denial of the defendant’s request for a SPECT scan where the experts did not testify that the test was necessary to form their medical opinion, but only that the exam results would confirm the experts’ already established opinions. In this case, as in Robinson, the trial court could conclude that the test was not needed for the experts to form an opinion, nor was it requested in order to rebut evidence adduced by the state or to develop the theory of defense. As the test was requested simply to confirm the expert’s initial conclusions, we find the trial court had discretion to decide that Mangum failed to make an adequate showing of need for the neurological test.
Further, Mangum failed to show that he was prejudiced by the denial of his request. At trial, Mangum did not present any evidence that he suffered from delusions or hallucinations. Rather, Mangum argued that he shot the victim in self-defense. Had the defense asserted that Mangum lacked the requisite mental capacity to form the specific intent necessary to commit first-degree murder, it could have relied on expert testimony, as well as the MMPI and the WISC-R responses. Additionally, even if there were some indication in the record that an insanity defense was planned, the sparsity of the information furnished to the court with regard to the need for the test and the absence of any showing that there were no other alternatives, would, in any event, support the trial court’s exercise of discretion.
As to all other issues raised, we also find no reversible error or abuse of discretion and affirm.
DELL and TAYLOR, JJ., concur.